

**EXHIBIT 1**



TRUBRIDGE, LLC

Master Services Agreement

for

CROOK COUNTY MEMORIAL HOSPITAL

October 8, 2020



# Master Services Agreement

**TRUBRIDGE, LLC**, a Delaware Limited Liability Company, (hereinafter "TruBridge") is the provider of certain services and INASMUCH AS,

**CROOK COUNTY MEMORIAL HOSPITAL**

(hereinafter "Customer") wishes to obtain services as described herein and TruBridge is willing to make said services available to Customer,

NOW, THEREFORE, in consideration of the mutual covenants hereinafter contained and of other good and valuable consideration the parties do mutually agree as follows:

1. **Engagement for Services:** TruBridge agrees to furnish, and Customer agrees to accept and pay for, Services as set forth in EXHIBIT A (each a "Service" and collectively the "Services"). It is expressly understood that TruBridge shall only provide Customer with the Services specified in EXHIBIT A. Additional Services may be added by separate addendum to this Agreement.

2. **Service Term:**

    (a) **Business Services and Managed IT Services:** Services identified in an EXHIBIT A as a business service ("Business Service") or a managed information technology service ("Managed IT Service") shall become effective upon the first day of the first month in which service is provided under a given EXHIBIT A and shall remain in effect for the initial service term specified in the Service's EXHIBIT A. Upon expiration of a Business Service's or a Managed IT Service's initial service term, the Service shall be automatically extended on an annual basis unless sixty (60) days prior to the expiration date of the initial service term, or any extended term, either party gives written notice of its intent to terminate the Service.

    (b) **Consulting Services:** Services identified in an EXHIBIT A as a consulting service ("Consulting Service") shall become effective upon commencement of the Service and shall remain in effect through the service term specified in the Service's EXHIBIT A.

3. **Charges:**

    (a) **Service Fees:** Customer agrees to pay TruBridge Service Fees for each Service engagement per the payment schedule set forth in the Service's EXHIBIT A during the term of the Service. TruBridge shall notify Customer of any change in the Service Fee for a Service under this Agreement at least ninety (90) days prior to the expiration of the Service's term.



# Master Services Agreement

(b) **Travel Expenses:** Any travel by TruBridge representatives to Customer's site shall be governed under the terms of TruBridge's Travel Policy and all expenses for such travel shall be billed to Customer as incurred.

4. **Payment:** All charges for service under this Agreement shall be due and payable upon receipt by Customer of TruBridge's invoice for such charges. Any such invoices which are not paid in full within thirty (30) days of the invoice date shall bear interest at the rate of one and one-half percent (1.5%) per month on the unpaid balance. All amounts paid under this Agreement shall be non-refundable and made electronically via i) Automated Clearing House/Electronic Funds Transfer ("ACH/EFT") transactions; ii) credit card transactions; or iii) other alternate payment methodology as may be mutually agreed upon by the parties. Credit card payments are subject to a three percent (3%) processing fee.

**TruBridge shall have the right and discretion to suspend and/or cancel services under this Agreement by sending written notice to that effect to Customer at any time when Customer has failed to pay an undisputed invoice within sixty (60) days.**

5. **Taxes:** Customer shall pay any and all taxes (except TruBridge's Federal and State Income Taxes) assessed by any local, state or federal taxing authority with respect to Services rendered pursuant to this Agreement.

6. **Additional Customer Responsibilities:** Any additional Customer responsibilities associated with a Service engagement, if any, shall be specified in the Service's Exhibit A.

7. **Save Harmless:** Customer shall assume the entire responsibility and liability for, and shall indemnify and save harmless TruBridge and its employees from and against, any and all loss or injury that any of them may sustain as a result of any third party claims arising out of or in connection with any patient care or related services provided by Customer or any of its employees, except to the extent that such loss or injury results from the willful misconduct or gross negligence of TruBridge or any of its employees. Customer agrees to assume the defense of any such claims at law or in equity that may be brought against TruBridge or any of its employees and to pay the amount of any judgment that may be entered against TruBridge or any of its employees or the amount of any reasonable settlement of any such claims.

8. **Liability:** TruBridge's liability for furnishing service under this Agreement shall be limited to providing the services described. TruBridge shall not be liable for any damages or losses incurred by Customer as a result of the loss of use of the services, or any part or component thereof, or any incidental or consequential damages



# Master Services Agreement

RESULTING FROM OR OCCASIONED BY THE FAILURE OF TRUBRIDGE TO PERFORM ANY OBLIGATION UNDER THIS AGREEMENT.

9. **Delays:** TruBridge shall not be liable for any delay or failure to provide the Services or to perform any other duty or obligation hereunder where such failure resulted from, arose out of, or was caused by, any cause or event beyond the reasonable control of TruBridge.

10. **Business Services Implementation:**

    (a) **Implementation Timeframe:** The parties mutually agree to implement each Business Service specified in EXHIBIT A, if any, within one hundred eighty (180) days of the execution of this Agreement or, for Business Services added through execution of an Addendum, the execution of such Addendum (the "Implementation Timeframe").

    (b) **Delays:** In the event of a failure to implement a Business Service during the Business Service's designated Implementation Timeframe and such failure is directly attributable to the action(s) or inaction of TruBridge, TruBridge shall provide Customer with a credit to be applied to Customer's account in an amount equal to the first month's Service Fees for the affected Business Service. In the event of a failure to implement a Business Service during the Business Service's designated Implementation Timeframe and such failure is directly attributable to the action(s) or inaction of Customer, Customer shall be liable for payment to TruBridge a fee in the amount of five thousand dollars ($5,000). A delaying party shall not be liable for any failure to implement a Business Service during the Implementation Timeframe, where such failure resulted from, arose out of, or was caused by, any cause or event beyond the party's reasonable control.

11. **Connectivity:** Certain Business Services and Managed IT Services will require Internet connectivity. Customer is responsible for securing and maintaining any connectivity and/or communication services and any associated equipment at Customer's location(s) as may be necessary for the implementation of Services under this Agreement.

    **It is expressly understood that, unless Internet Access Services are specifically included in this Agreement under an EXHIBIT A, TruBridge will not be providing Customer with any connectivity or communication services.**

12. **Data Access:** It is mutually understood that Customer must provide TruBridge with access to the data necessary to perform the Service(s) during the term of this Agreement. In the event Customer intentionally creates any impediment to such access (an "Impediment"), Customer agrees to pay TruBridge an amount equal to the prorated Service Fees that would have accrued for an affected Service during the remainder of the Service's then current term. The



# Master Services Agreement

prorated Service Fees shall be calculated based upon the average monthly Service Fees for the affected Service provided in the previous six (6) months. TruBridge shall provide Customer with written notification upon becoming aware of an Impediment and Customer shall have five (5) business days from the receipt of such written notice to cure the Impediment. In the event the Impediment is not cured within five (5) business days, the prorated Service Fees shall then become due and payable in full.

13. **Independent Contractors:** The parties to this Agreement are independent contractors. There is no relationship of partnership, joint venture, employment, franchise or agency created hereby between the parties. Neither party will have the power to bind the other or incur obligations on the other party's behalf without the other party's prior written consent.

14. **Waiver and Severability:** Waiver or failure by either party to exercise in any respect any right provided for in this Agreement will not be deemed a waiver of any further right under this Agreement. If any provision of this Agreement is found by a court of competent jurisdiction to be unenforceable for any reason, the remainder of this Agreement will continue in full force and effect.

15. **Notices:** Written notices required hereunder shall be sent to the address of the receiving party specified below or a valid electronic mail address of an authorized representative of the receiving party.

16. **Assignment:** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither this Agreement nor any of the rights hereunder may be assigned, sold or otherwise transferred by a party without the express written consent of the other. Such consent will not be unreasonably withheld. Notwithstanding the foregoing, Customer's account must be in good standing and Customer must be current with all its obligations specified under the terms of this Agreement prior to the assignment of the Agreement to a third party.

17. **Confidentiality:**

    a. **Confidential Information:** The parties hereto acknowledge that all information, knowledge, know-how, data, and documents of, and any software systems developed by, a party, to include such information conveyed in whatever form, whether specifically marked as confidential or not, constitute valuable assets of and are proprietary to such party (collectively referred to herein as "Confidential Information"). Each party agrees to hold the other party's Confidential Information in strict confidence and shall not disclose



# Master Services Agreement

any Confidential Information without the prior written consent. This provision shall survive termination of this Agreement.

The confidentiality responsibilities specified herein shall not apply to any information that:

(i) is in or comes into the public domain through no breach of this Agreement;

(ii) is acquired from a third party who owes no obligations of confidence to the other party to this Agreement in respect thereof,

(iii) was already known at the time received as shown by prior written records, or

(iv) was independently developed without violating any obligation under this Agreement.

b. **Use of Confidential Information; Return/Destruction:** Confidential Information may only be used for internal operations and exclusively for the purposes for which the Confidential Information was disclosed. Access to Confidential Information shall be limited to individuals with a need to know and further limited to only those portions that are necessary. Upon termination of this Agreement, each party shall either return or destroy all of the other party's Confidential Information in its possession.

c. **Disclosures Required by Law:** If either party is required by any legal or investigative process to disclose any Confidential Information, that party shall provide the other with prompt notice of each such request and the information requested, so that the other party may seek to prevent disclosure or the entry of a protective order. If disclosure is lawfully required and a protective order is not obtained, the party from whom disclosure is required shall disclose only such information as may be required to meet the requirements of the order for disclosure.

d. **No License, Representations or Warranties:** Nothing in this Agreement is intended to grant either party any rights to the intellectual property right of the other party. All Confidential Information shall be deemed the property of the disclosing party. ALL CONFIDENTIAL INFORMATION SHALL BE FURNISHED IN GOOD FAITH, BUT IT IS EXPRESSLY UNDERSTOOD THAT CONFIDENTIAL INFORMATION IS PROVIDED "AS IS" WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY KIND.

18. **Entire Agreement:** This Agreement, to include EXHIBIT A, embodies the entire agreement between the parties hereto with respect to Services and supersedes all other oral or written agreements regarding the subject matter contained herein. Any waiver, modification or



# Master Services Agreement

amendment of any provision of this Agreement will be effective only if in writing and signed by both parties.

19. **Governing Law; Venue:** This Agreement shall be construed and enforced under the laws of the State of Alabama, excluding rules as to choice and conflict of law.  The exclusive and sole venue for any action brought to enforce or interpret this Agreement shall be the state and federal courts situated in Mobile County, Alabama and each party hereby consents to the exercise of personal and subject-matter jurisdiction by such courts.

*[Signature page follows]*



# Master Services Agreement

**IN WITNESS WHEREOF,** the parties hereto have executed this Master Services Agreement.

**CROOK COUNTY MEMORIAL HOSPITAL**

713 East Oak Street

Sundance, WY 82729

By: _Micki Lyons_____
    (Authorized Signature)

Name: __Micki Lyons_____
     (Printed)

Title: __Chief Executive Officer_____

Date: __Oct 9, 2020_____


**TRUBRIDGE, LLC**

3725 Airport Boulevard, Suite 208A

Mobile, AL 36608

By: _Christopher L Fowler_____
    Christopher L Fowler (Oct 9, 2020 16:16 CDT)
    (Authorized Signature)

Name: __Christopher L. Fowler_____
     (Printed)

Title: __President_____

Date: __Oct 9, 2020_____



# Master Services Agreement
# Exhibit A
# Services and Service Fees

## Business Service:  Accounts Receivable Management

A.  **Services and Fees**:

1.  **Services**:  Accounts Receivable Management services will include:

- The operation of a central business office electronically from Mobile, Alabama.

- Initial service set-up and education of Customer personnel.

- The billing of all patients, to include inpatients, sub-acute patients, outpatients, skilled nursing facility patients, emergency room patients and all professional fees to include:
  - The billing of all primary and secondary claims to all third party payers.
  - Management of cash receipts and accounts receivable.
  - Prompt follow up on all unpaid insurance claims.

- Provision and use of the following applications:
  - Claim Scrubbing and Submission
  - Remittance Management
  - Electronic Remittance Advice (ERA) Retrieval
  - Denial/Audit Management
  - Claim Status
  - Medicare Direct
  - Medicare Navigator
  - Eligibility Verification
  - Patient Liability Estimator
  - Contract Management

- Maintenance f all contract management tables.

- Performance of contract payment audits.

- The opening and maintaining of a "lockbox" account at a bank whereby all monies received from remittances would be processed by the bank and posted to the lockbox account.  Remittances would then be forwarded to TruBridge for posting.

- The establishment of a toll-free customer service line specifically for billing inquiry.

- Establishment of a communication connection.

**Service Liaison**:  TruBridge will provide a TruBridge consultant to function as a service liaison between TruBridge and the Customer staff during two (2) months of the initial Service



# Master Services Agreement
# Exhibit A
# Services and Service Fees

## Business Service:  Accounts Receivable Management

Term.  The consultant shall perform services on-site three (3) weeks per month and remotely one (1) week per month.  Services will be provided Monday through Friday each week of the consulting engagement except for holidays and travel days.

**Equal Treatment:** TruBridge shall treat all patients equally, regardless of patient financial status, in the performance of any of the above billing and/or collection services.

**Service Exclusivity:**  It is expressly understood and agreed that, during the term of this Exhibit A, i) TruBridge will be Customer's exclusive provider of the services defined herein for the patient accounts specified herein; ii) Customer will not engage any third party to perform any of the services defined herein for the patient accounts specified herein; and iii) any such third party engagement by Customer would constitute a breach of the Agreement and Customer would be liable to TruBridge for damages.

2. **Service Fee/Payment Schedule:**

   a. **Service Fees:**  Service fees will be calculated monthly as a percentage of total Cash Collections based upon the Service Rate specified below.

   **i.**  Service Rate:                                                                **5.43%**

   ii.  **Rate Adjustments:**  The Service Fee Rate will be reviewed every three (3) months and adjusted based upon the following schedule:

   | Annualized Cash Collections | Rate |
   | --- | --- |
   | $7 Million or Less | 6.33% |
   | More than $7 Million but less than $9 Million | 5.43% |
   | $9 Million and Greater | 4.90% |

   b. **Payment:**

   i.  **Electronic Payment:**  Payment of the above Service Fees shall be made weekly via either ACH/EFT or credit card transactions.  Each month's weekly fees will be drafted based upon an estimated monthly fee (the "Estimated Monthly Fee") and in accordance with the following schedule:

   Week 1      Twenty-five Percent (25%) of the Estimated Monthly Fee

   Week 2      Twenty-five Percent (25%) of the Estimated Monthly Fee



# Master Services Agreement
# Exhibit A
# Services and Service Fees

## Business Service:  Accounts Receivable Management

| | |
|---|---|
| Week 3 | Twenty-five Percent (25%) of the Estimated Monthly Fee |
| Week 4 | Actual Calculated Monthly Fee less fees actually paid in Weeks 1, 2 and 3 |

The parties shall mutually agree upon the initial Estimated Monthly Fee to be used for the first three (3) months of services provided under this Exhibit A.  At the end of each three (3) month period, TruBridge shall average the actual monthly fees calculated for the preceding three (3) months and such average shall be used as the Estimated Monthly Fee for the subsequent three (3) month period.

ii. **Payment Default:**  In the event such a transaction is returned by the processor or rejected by Customer, TruBridge may require payment via a lockbox account to be controlled by TruBridge but to which Customer will have view only access.  Customer shall be responsible for all costs associated with the establishment and maintenance of the lockbox account.  Each business day, TruBridge will deduct the then current Service Rate from funds received into the lockbox and will release the remaining balance of funds to an account designated by Customer.  At the end of each month, TruBridge will review Cash Collections for the month plus the lockbox costs and will compare amounts paid via the lockbox account to the total due for the month for services rendered under this Exhibit A.  If the amount deducted during the month is less than the total due for the month, TruBridge will deduct the additional amount due from the lockbox account until the monthly fee is paid in full.  If the amount deducted during the month exceeds the total due for the month, TruBridge will refund the overpayment to Customer.

B. **Customer's Responsibilities:**

1. **Service Responsibilities:**  Customer's responsibilities will include the following:

   - The capture of all patient demographic, insurance and encounter information.
   - The entry of all patient charges.
   - Maintenance of all business office, insurance, and item master tables.
   - Customer service for walk-in inquiries/payments and local calls.
   - Maintenance of Medicare Bad Debt logs.



# Master Services Agreement
# Exhibit A
# Services and Service Fees

## Business Service:  Accounts Receivable Management

- The production and submission of all reports necessary to meet regulatory requirements.

- Providing authorization of and cooperation with the opening of the lockbox.  In the event TruBridge is required to provide services under this Exhibit in the absence of a lockbox and such absence is due to Customer's action or inaction, the Service Rate shall be increased by additional one tenth of a percentage point (+.1) until such time as the lockbox is implemented.

- Payment of Service Fees accruing under this Exhibit A via ACH/EFT transactions.

- The Customer's Chief Financial Officer or the individual assigned to those duties shall act as a liaison between TruBridge and Customer staff in the resolution of any identified issues.

- With the exception of any hardware necessary at TruBridge's location, the purchase of any peripheral hardware necessary for the implementation of the services.

2. **Hiring of TruBridge Employees**:  If, during the term of this Exhibit A or twelve (12) months thereafter, Customer directly or indirectly retains the services (whether as an employee, independent contractor or otherwise) of any employee of TruBridge  (or ex-employee within 3 months of his/her employment termination date) who, in the course of this engagement, has provided service to Customer on behalf of TruBridge, Customer agrees that TruBridge will be damaged, but that the amount of this damage will be difficult to determine.   Accordingly, Customer agrees that for each such TruBridge employee hired by Customer, Customer will pay TruBridge, one hundred thousand dollars ($100,000.00) as liquidated damages.

C. **Service Term:**                                            Five (5) Years

1. **Cancellation at the End of the Initial Term**:  It is mutually understood that no claims can be submitted for reimbursement from Medicare, Medicaid, or Blue Cross until such time as Customer receives a Provider Number from the appropriate issuing authorities for each.  In the event Customer wishes to cancel this Agreement at the end of the Initial Term but did not receive its Provider Numbers for Medicare, Medicaid, and Blue Cross prior to the Effective Date of the Agreement, the Initial Term shall be extended by the amount of time between the Effective Date of the Agreement and the date upon which Customer received the last of its



# Master Services Agreement
# Exhibit A
# Services and Service Fees
## Business Service:  Accounts Receivable Management

Provider Numbers for Medicare, Medicaid, and Blue Cross.  In such event, cancellation shall be effective upon the completion of the extended Initial Term.

2. **Extended Delay**:  In the event service under this Exhibit A is not implemented within six (6) months of the date the instrument to which this Exhibit A is attached was executed by the second signatory and such failure is due solely to actions or inaction of Customer, i) this Exhibit A shall become effective upon the first day of the seventh (7th) month for the purpose of assessing a monthly penalty and shall remain in effect for a period equal to the Service Term specified above (the "Penalty Period"); ii) Customer shall pay TruBridge a monthly penalty in the amount of ten thousand dollars ($10,000.00) per month during the Penalty Period; iii) penalty payments shall be due on the first day of each month of the Penalty Period; and iii) after completion of the Penalty Period this Exhibit A shall be terminated. Notwithstanding the forgoing, Customer may elect to implement the service at any time during the Penalty Period with such implementation taking place at the earliest date practicable.  In the event Customer elects to implement the service, i) the monthly penalty assessments shall cease as of the service commencement date; ii) services under this Exhibit A shall be provided for period equal to the full Service Term specified above; iii) standard billing in accordance with Section A(2) above shall apply; and iv) automatic renewals as specified in Section 2(A) of the Agreement shall apply.

D. **Cash Collections:**  For the purposes of this Exhibit A, "Cash Collections" shall be defined as follows:

1. **Included Receipts:**  Cash Collections shall include all patient accounts receivable receipts which are directly related to and collected for professional medical and ancillary services rendered by or through Customer, during the term of this Exhibit A, for the portions of Customer's patient accounts receivables receiving services under this Exhibit A.  Such receipts shall include, but are not limited to, the following:

   a. All Accounts Receivable receipts for patient accounts receivable described above;

   b. Any reimbursement or payments based on Cost Report calculations, patient charges or accounts receivable described above prorated based upon the period of time during the reimbursement/payment period in which services were provided under this Exhibit A,



# Master Services Agreement
## Exhibit A
## Services and Service Fees

## Business Service:  Accounts Receivable Management

including but not limited to: Indigent Care Trust Fund (ICTF) receipts, Medicaid Enhancement receipts and Upper Payment Limit (UPL) receipts; and

c.  Any reimbursement or payments for charity or indigent care which are based on patient accounts receivable described above.

Any amounts refunded or credited to a patient or third party payer as a result of discounts, overpayments, erroneous payments, or bad checks shall be deducted from the calculation of Cash Collections.

2.  **Excluded Receipts:**  Cash Collections shall not include any General Ledger receipts, which are not directly related to patient accounts receivable described in Section D(1) above.  Such excluded receipts shall include, but are not limited to, contributions, donations, interest income, cafeteria sales and vending sales.

E.  **Employee Subcontracting:**

1.  **Subcontracted Employees:**  Customer currently has one or more employees on staff that that may be retained by Customer and utilized by TruBridge in the performance of some of the services to be provided under this Agreement in a subcontractor capacity (each a "Subcontractor").

2.  **Subcontractor Employment:**  It is expressly understood that this Agreement shall not be deemed to represent or evidence TruBridge's offer of employment to a Subcontractor and each Subcontractor shall remain an employee of Customer.  Customer shall be liable for the calculation and management of Subcontractor time, wages, withholdings, reimbursements and benefits, payment of all Subcontractor wages, reimbursements and employer tax contributions, distribution of Subcontractor's withholdings to include, but not be limited to, any and all Federal, State and local employment withholding taxes and employer contributions and compliance with all applicable Federal, State and local employment laws and regulations. Customer shall notify TruBridge immediately of any unplanned changes in a Subcontractor's employment or reassignment to other duties.  Customer shall notify TruBridge in writing of any planned changes in a Subcontractor's employment status or duties at least two (2) weeks prior to the implementation of the planned change.



**Master Services Agreement**
**Exhibit A**
**Services and Service Fees**

**Business Service:  Accounts Receivable Management**

3.  **Save Harmless:**  Customer shall assume the entire responsibility and liability for, and shall indemnify and save harmless TruBridge and its employees from and against, any and all loss or injury that any of them may sustain as a result of any claims arising out of or in connection with the employment of a Subcontractor.  Customer agrees to assume the defense of any such claims at law or in equity that may be brought against TruBridge or any of its employees and to pay the amount of any judgment that may be entered against TruBridge or any of its employees or the amount of any reasonable settlement of any such claims.

4.  **Credit for Subcontractor Services:**  TruBridge shall provide Customer with a monthly credit of $3,750 per Subcontractor.

5.  **Subcontractor Removal:**  TruBridge reserves the right, in its sole discretion, to require the immediate removal of a Subcontractor by providing Customer with written notice, however, it is expressly understood that Customer shall retain all authority in regard to a removed Subcontractor's employment with Customer.



# Master Services Agreement
# Exhibit A
# Services and Service Fees

## Business Service: nTrust – EHR Service (Evident)

### A. Services and Fees:

1. **Services:** The Electronic Health Record (EHR) Service will include access to the cloud-based EHR as defined in the Evident Terms and Conditions to include;

   - Access to the defined application software modules;
   - Provision of any specified hardware and system software;
   - Provision of applicable conversion and implementation services;
   - Provision of applicable content and service subscriptions; and
   - Provision of software, technical, hardware, and subscription support services.

   **Service Provider:** All EHR Services will be provided by Evident, LLC ("Evident"). As a third party provider, Evident requires additional terms and conditions applicable to the provision of their products and services. The "Evident Terms and Conditions" shall be defined as the Evident EHR Service - Terms and Conditions and the Evident Subscription Services - Terms and Conditions, including their respective schedules, as provided herein. Customer understands that in accepting the EHR Service it is also accepting the Evident Terms and Conditions and agrees to abide by the same.

   **Service Contingency:** Services under this Exhibit A are contingent upon the continuation of services under the Exhibit A for Accounts Receivable Management Services ("ARMS"). In the event the Exhibit A for ARMS is terminated, this Exhibit A shall terminate as of the termination date of the Exhibit A for ARMS.

2. **Service Fees/Payment Schedule:**

   a. **Service Activation Fee** – Due at signing          Waived

   b. **Monthly Service Fee**:          Included*

   > *Note: The monthly EHR Service Fee will be included in the monthly service fee assessed under the Exhibit A for Accounts Receivable Management Services.

### B. Service Term:          Five (5) Years



# Master Services Agreement
# Exhibit A
# Services and Service Fees

**Business Service:   nTrust – EHR Service (Evident)**

**Evident EHR Service - Terms and Conditions**

Evident, LLC, a Delaware Limited Liability Company, ("Evident") has developed and is the owner of certain computer software systems (the "System") and

Inasmuch as, Customer wishes to obtain access to use the System as a service, and Evident is willing to provide Customer with such access to the System,

Now, therefore, in consideration of the mutual covenants hereinafter contained and of other good and valuable consideration the parties do mutually agree as follows:

1. **Engagement for EHR Services:** Evident agrees to furnish, and Customer agrees to accept and pay for, access to the System through Electronic Health Record ("EHR") Services and the associated services as set forth in Schedule 1 (collectively the "EHR Services").  It is expressly understood that Evident shall only provide Customer with the services specified in Schedule 1.  Additional software, hardware and associated services requested by Customer in the future may be added to this Agreement by execution of an addendum and thereafter will be considered included in Schedule 1.

2. **Deliverables:** The software and hardware as configured in Schedule 1 will be delivered to Customer to provide access to the System through the EHR Services.  Evident hereby authorizes Customer subject to the provisions of this Agreement to use a single entity version of the System described in Schedule 1.  All rights to the System not expressly granted to Customer by this Agreement are retained by Evident.

3. **System Use:** Customer understands and agrees that it is being granted access through the EHR Services to use the software owned and developed by Evident and that amounts paid by it to Evident pursuant to this Agreement are not intended to and do not fully reimburse Evident for the full expense of developing the software.  Customer agrees that payment of any amounts pursuant to this Agreement confer upon it access to use the software subject to Evident's proprietary rights to the same.  Such access does not include the right to reproduce, publish or license any part of the software for use by an unrelated third party.  Evident expressly reserves and Customer expressly consents that the entire right and title to the software is and shall remain in Evident.  Evident has the exclusive right to protect by copyright or otherwise, to reproduce, publish, sell and distribute the System to any other customer.  If Customer reproduces, publishes, licenses or furnishes the software to or for the benefit of any other person, or if Customer uses the software on any servers other than the ones described herein, all rights conferred upon Customer shall immediately terminate and Customer agrees that it will be liable for any monetary damages to Evident which were caused by Customer's violation of this Agreement.  Customer



# Master Services Agreement
# Exhibit A
# Services and Service Fees

**Business Service:   nTrust – EHR Service (Evident)**

**Evident EHR Service - Terms and Conditions**

may make copies of the software, provided (a) such copies are solely for archival or backup purposes and (b) Evident's copyright or proprietary rights notices are not removed or altered.

4. **Risk of Use:** Evident believes the System is accurate and reliable but it is expressly and mutually understood and agreed that amounts paid to Evident pursuant to this Agreement do not include payment for any assumption of risk by Evident and Evident does not hereby accept any financial or other responsibility for any consequences arising out of the use of the System by Customer.  The provisions of this Section 5 apply not only to the System but also to any further material which may be furnished by Evident to Customer.

5. **Additional Services:** If Customer requests service outside the scope of the EHR Services, such service shall be furnished at Evident's option as "Additional Services" at its lowest current hourly rates and material charges.  Any Additional Services shall be billed to Customer by TruBridge, LLC.

6. **Customer Responsibilities:**

   a. **Unauthorized Service:** All maintenance service will be performed by Evident employees or Customer designated hospital employees under the direction of a Evident employee.  Customer agrees that it will not permit any other persons to perform or make any maintenance, adjustments, or repairs to equipment maintained hereunder.  Any repairs or damages caused by unauthorized service shall be the responsibility of the Customer and shall not be covered under this Agreement.

   b. **Application of Enhancements:** Customer shall authorize the loading of each software enhancement release provided by Evident on to the server(s) utilized by Customer for live System operations and transaction processing no more than one hundred twenty (120) days from the date of the general distribution of the release.

   c. **Certification:** Certain applications provided by Evident require annual user certification from Evident.  If such software applications are supported under this Agreement, Evident will provide Customer with annual user certification training at no additional cost.  It is expressly understood that Evident, at its option, may terminate support for any application that requires such user certification should Customer fail to receive or maintain the required certification for the application.

   Evident reserves the right to suspend and/or terminate its support obligations if Customer fails to meet its responsibilities described above.

7. **Configuration:** Customer understands and specifically agrees that the System is intended for use only with the equipment described in Schedule 1 and further understands that the System may not be



# Master Services Agreement
# Exhibit A
# Services and Service Fees

## Business Service:   nTrust – EHR Service (Evident)

## Evident EHR Service - Terms and Conditions

compatible with certain types of equipment.  Evident makes no representation or warranty of any sort that the System will be compatible for use with any equipment other than that described herein.

8.  **Warranty:** Evident hereby warrants that the System will perform according to the Warranty Specifications.  "Warranty Specifications" shall be defined as all written documentation provided by Evident to Customer inclusive of Evident's response to Customer's request for proposal, if any, and all application software manuals, operations manuals, training materials, and any updates thereto, used in conjunction with the System.

9.  **Insurance:** Customer shall keep any Evident supplied equipment located at any Customer facility insured against loss by fire, theft and all other hazards (comprehensive coverage) by insurers and in form, amount and coverage satisfactory to Evident, but not less than the original cost of the equipment, or such other amount as shall be approved by Evident in writing.  The Customer shall bear the entire risk of loss or damage to said equipment from any cause.

10. **Save Harmless:** Customer shall assume the entire responsibility and liability for, and shall indemnify and save harmless Evident and its employees from and against, any and all loss or injury that any of them may sustain as a result of any third party claims arising out of or in connection with any patient care or related services provided by Customer or any of its employees, except to the extent that such loss or injury results from the willful misconduct or gross negligence of Evident or any of its employees. Customer agrees to assume the defense of any such claims at law or in equity that may be brought against Evident or any of its employees and to pay the amount of any judgment that may be entered against Evident or any of its employees or the amount of any reasonable settlement of any such claims.

11. **Liability:** Evident's liability for furnishing the System and Service under this Agreement shall be limited to replacing the Equipment and restoring the Software covered by this Agreement to good operating condition.  Evident shall not be liable for any damages or losses incurred by the Customer as a result of the loss of use, or failure of the Equipment, or any part or component thereof, to perform, or for any incidental or consequential damages resulting from or occasioned by the failure of Evident to perform any obligation under this Agreement.  In no event shall Evident's liability exceed the cost of replacement or repair of such Equipment and Software.

12. **Delays:** Evident shall not be liable for any delay or failure to provide the EHR Services, or to perform any other duty or obligation, if the delay or failure resulted from, arose out of, or was caused by, any cause or event beyond the reasonable control of Evident.



# Master Services Agreement
## Exhibit A
## Services and Service Fees

**Business Service:   nTrust – EHR Service (Evident)**

**Evident EHR Service - Terms and Conditions**

13. **Assignment:** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Neither this Agreement nor any of the rights hereunder may be assigned, sold or otherwise transferred by a party without the express written consent of the other.  Such consent will not be unreasonably withheld.  Notwithstanding the foregoing, Customer's account must be in good standing and Customer must be current with all of its obligations prior to the assignment of the Agreement to a third party.

14. **Confidentiality:**

   a. **Confidential Information:**  The parties hereto acknowledge that all information, knowledge, know-how, data, and documents of, and any software systems developed by, a party, to include such information conveyed in whatever form, whether specifically marked as confidential or not, constitute valuable assets of and are proprietary to such party (collectively referred to herein as "Confidential Information").  Each party agrees to hold the other party's Confidential Information in strict confidence and shall not disclose any Confidential Information without the prior written consent.  This provision shall survive termination of this Agreement.

   The confidentiality responsibilities specified herein shall not apply to any information that:

       (i)    is in or comes into the public domain through no breach of this Agreement;

       (ii)    is acquired from a third party who owes no obligations of confidence to the other party to this Agreement in respect thereof,

       (iii)    was already known at the time received as shown by prior written records, or

       (iv)    was independently developed without violating any obligation under this Agreement.

   b. **Use of Confidential Information; Return/Destruction:**  Confidential Information may only be used for internal operations and exclusively for the purposes for which the Confidential Information was disclosed.  Access to Confidential Information shall be limited to individuals with a need to know and further limited to only those portions that are necessary.  Upon termination of this Agreement, each party shall either return or destroy all of the other party's Confidential Information in its possession.

   c. **Disclosures Required by Law:**  If either party is required by any legal or investigative process to disclose any Confidential Information, that party shall provide the other with prompt notice of each such request and the information requested, so that the other party may seek to prevent disclosure



# Master Services Agreement
## Exhibit A
## Services and Service Fees

**Business Service:   nTrust – EHR Service (Evident)**

**Evident EHR Service - Terms and Conditions**

or the entry of a protective order.  If disclosure is lawfully required and a protective order is not obtained, the party from whom disclosure is required shall disclose only such information as may be required to meet the requirements of the order for disclosure.

d.   **No License, Representations or Warranties:**  Nothing in this Agreement is intended to grant either party any rights to the intellectual property right of the other party. All Confidential Information shall be deemed the property of the disclosing party.  ALL CONFIDENTIAL INFORMATION SHALL BE FURNISHED IN GOOD FAITH, BUT IT IS EXPRESSLY UNDERSTOOD THAT CONFIDENTIAL INFORMATION IS PROVIDED "AS IS" WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY KIND.

15. **Entire Agreement:** This Agreement, to include SCHEDULES 1 and 2, sets forth the entire understanding of the parties hereto and superseded all other oral or written representations except as otherwise provided herein.

16. **Governing Law:** This Agreement shall be subject to and governed by the laws of the State of Alabama.

17. **Third Party Intellectual Property Rights:**  Customer is solely responsible for obtaining any and all licenses necessary for the electronic use of any content not provided by Evident and that may be subject to intellectual property rights of a third party.  Customer warrants that it will not use the System in violation of any intellectual property rights.  In the event it is suspected that Customer is maintaining within the System any content in violation of intellectual property rights, Evident shall notify Customer of such suspected violation and provide Customer an opportunity to i) provide documentation of Customer's right to use the content; or (ii) obtain any required licensing for continued use of the content and documentation of the same.  Evident shall have the right to verify Customer's right to use the content with the owner of the intellectual property rights of the content (the "Owner").  In the event Customer does not acquire the right to use the content within a reasonable period of time, Evident shall have the right to i) notify the Owner of the suspected violation of its intellectual property rights, ii) remove the content as may be required by the Owner, and/or iii) suspend Customer's right to use affected portions of the System until such time as Customer obtains any required licensing for the content.

18. **Source Code Escrow:**  For as long as Evident is obligated to provide Customer with Support Services for the Application Software listed under SCHEDULE 1 in this Agreement, Evident will deposit and maintain with its Escrow Agent a copy of the source code for the current version of such Software.  In the event Evident, (1) is adjudicated as bankrupt by any court of competent jurisdiction; or (2) a trustee, receiver or similar official is appointed for all or a substantial part of the property of Evident under



# Master Services Agreement
# Exhibit A
# Services and Service Fees

## Business Service:   nTrust – EHR Service (Evident)

## Evident EHR Service - Terms and Conditions

federal bankruptcy law or similar state law; or (3) in the event of liquidation of Evident, its failure to continue its business operations and there is no successor which assumes Evident's service obligations, then Customer may obtain a copy of the application source code by sending a written notice via certified mail to the Escrow Agent with a copy to Evident, also by certified mail.

Such notice shall certify that (1) one of the above events has occurred, (2) provide a basis for such claim, (3) identify this Source Code Escrow Addendum, (4) affirm that Customer is then currently entitled to receive service for the Software under this Addendum and (5) acknowledge that Customer shall use the source code pursuant to the terms and conditions of this Agreement and solely for the service of the Software.  To the extent notice is given in accordance with the foregoing and Customer is not in material failure of any provision of this Agreement, the Escrow Agent shall release the source code to Customer.  Customer shall pay directly to the Escrow Agent the costs of reproducing and shipping the Source Code prior to such reproduction and shipment.

Escrow Agent:  Frazer, Greene, Upchurch & Baker, LLC, P.O. Box 1686, Mobile, AL 36633.

Evident will advise Customer of any change in the Escrow Agent or in the address of the Escrow Agent.

19. **Third Party Software:**  The application software of the Evident System incorporates software and content that is provided by third parties.  Certain third party suppliers require additional terms and conditions.  These terms and conditions are included in this Agreement by reference and will be provided to Customer upon request.

20. **Open Source:** Notwithstanding other statements in this Agreement, the System may include or require download of third party software including free, copyleft and open source software components (collectively referred to as "Open Source Software") that are distributed in compliance with the particular licensing terms and conditions of attributable to the Open Source Software.  Evident provides the Open Source Software to Customer "AS IS" without any warranties or indemnities of any kind.



# Master Services Agreement
# Exhibit A
# Services and Service Fees

## Business Service: nTrust – EHR Service (Evident)
## Evident EHR Service - Schedule 1

1. **System Access Services:**

   A. **Thrive EHR:**
      **Software**

      <u>ADT/Patient Accounting Applications</u>
      - Registration/ADT
      - Automated Registration Doc Sys
      - Electronic File Management
      - Digital Signature Capture
      - Patient Accounting
      - 837 File Download

      <u>Financial Applications</u>
      - General Ledger
      - Fixed Assets
      - Budgeting
      - Accounts Payable
      - 3R Management – Corporate Suite
      - Materials Management
      - Electronic Purchase Orders

      <u>Health Information Services Applications</u>
      - Health Information Management
      - Master Patient Index/CPI
      - TruCode

      <u>Clinical Applications</u>
      - Laboratory Information System
      - Four Bi-Directional Instrument Interfaces
      - Radiology Information System
      - OrderWise AUC
      - Cardiopulmonary
      - Physical Therapy
      - Pharmacy
      - Formulary Wholesale Cost Update Interface
      - Pharmacy Clinical Monitorin

      <u>Interface Management Applications</u>
      - Interface Management System
      - Bi-Directional Reference Lab Interface
      - Bi-Directional ADM Interface
      - Bi-Directional PACS Interface
      - PACS URL Interface
      - Public Health Interface

      <u>Patient Care Applications</u>
      - Order Entry/Results Reporting
      - Multi-disciplinary Point of Care Documentation – 8 Users
      - Micromedex CareNotes – Patient Education
      - Medication Management
      - ChartLink – 9 Providers
      - CPOE – 9 Providers
      - EPCS ID Proofing
      - EPCS – 9 Providers
      - Physician Documentation
      - Infobutton
      - Thrive Emergency Dept. Information System
      - Clinical Content – EDIS – 2 Users

      <u>Facility Applications</u>
      - Quality Improvement
      - Quality Measures
      - Core Measures
      - Executive Information
      - Electronic Forms
      - Patient Portal
      - Direct Messaging – 1 Hospital Direct Address
      - Enterprise Wide Scheduling
      - Thrive Provider EHR – Financial – 1 Practice
      - Thrive Provider EHR – Clinical – 9 Providers
      - Clinical Content – TP EHR – 9 Users
      - MU3 Bundle
      - CommonWell Network Access

      <u>Information Management Applications</u>
      - Ad Hoc Reporting
      - Auto-Fax
      - Archival Data Storage/Report Image

   **Cloud Computing**
   - 24 Hour Emergency Support
   - Thrive (UX)/Client Access – 60 Users
   - Runtime – 125 Devices
   - Stedman's Medical Dictionary

   - Auto-Fax Configuration
   - Print Appliance
   - Lab Communication Equipment



# Master Services Agreement
# Exhibit A
# Services and Service Fees

## Business Service:   Cloud EHR Service

## Evident Cloud EHR Service - Schedule 1

B.  **AHT EHR:**

| | |
|---|---|
| ▪ Resident Information | ▪ Smart Charting |
| ▪ Clinical | ▪ Orders Administration |
| ▪ Quality Assurance | ▪ Biometrics Interface |
| ▪ AT-Therapy | ▪ Barcode Medication Administration |
| ▪ Admissions Analysis | ▪ Document Import |
| ▪ Accounts Receivable | ▪ Communication Center with eReferral |
| ▪ Trust Funds | ▪ Clinical Decision Support |
| ▪ AT-Materials Management | ▪ AHT Workcenter |

C.  **Conversion/Setup:**  System setup and conversion of applicable data as described in SCHEDULE 2 from hospital's present system to the new System configuration.

D.  **Installation and Training:**  Installation and training services to include the installation of the software and hardware and education of hospital personnel in the operation of the hardware and correct use of the System.

E.  **Travel Expenses:**  Up to **one hundred two (102)** man-weeks of travel expenses for the implementation of the items identified in Section 1(A) above are included.  Unless otherwise agreed to in writing, all other travel expenses, to include any future implementations, shall be billed as incurred.

F.  **Extended Services:**  Post-acute care clinical and billing business process review.

G.  **Service Equipment:**  All equipment provided by Evident and specified under Section 1(A) under this Agreement for on-site use by Customer shall remain the property of Evident.

H.  **Hardware (Optional):**  Customer may purchase the hardware listed below at the specified pricing for a period of ninety (90) days from the execution of this Agreement.

i.  **Items/Prices:**

| Item Description | Unit Price | Qty | Total |
|---|---|---|---|
| Thrive Equipment | | | |
| Topaz Digital Signature Pad | $389.00 | 5 | $1,945.00 |
| Honeyw ell 1900 Barcode Scanner (Wired) | $386.00 | 2 | $772.00 |
| Zebra ZT230 Lable Printer | $3,489.00 | 1 | $3,489.00 |
| PC Back-up Station | $1,335.00 | 1 | $1,335.00 |
| Mobile Care Station | $5,234.00 | 3 | $15,702.00 |
| LexMark MS821 Printer (3 Tray) | $2,125.00 | 1 | $2,125.00 |
| **Thrive Hardware Total** | | | **$25,368.00** |



# Master Services Agreement
# Exhibit A
# Services and Service Fees

**Business Service:   Cloud EHR Service**

**Evident Cloud EHR Service - Schedule 1**

| Item Description | Unit Price | Qty | Total |
|---|---|---|---|
| AHT Equipment | | | |
| Pioneer Kiosk | $1,640.00 | 2 | $3,280.00 |
| HP Elitebook 850 G5 Touch | $1,308.00 | 1 | $1,308.00 |
| Network Cables (3 Foot) | $3.00 | 2 | $6.00 |
| Pioneer Power Transformer Cradle | $33.00 | 2 | $66.00 |
| Pioneer Fingerprint Scanner | $163.00 | 2 | $326.00 |
| Digital Persona Fingerprint Scanner USB | $99.00 | 1 | $99.00 |
| Remote Installation | $75.00 | 1 | $75.00 |
| **AHT Hardware Purchases** | | | **$5,160.00** |
| **Total Hardware Purchases** | | | **$30,528.00** |

ii.   **Payment:**  In the event Customer elects to purchase the above hardware from TruBridge, payment for any such hardware purchases as well as any other future purchases shall be in accordance with the following schedule:

- At Agreement signing/placement of order                                    10%

- Upon delivery of hardware to Customer                                      90%



# Master Services Agreement
# Exhibit A
# Services and Service Fees

## Business Service:   nTrust – EHR Service (Evident)
## Evident EHR Service - Schedule 1

2. **Support Services:**

    A. **Availability:**

- Standard Support Period:                                      8:00 A.M. to 5:00 P.M.

  Central time, Monday through Friday, except for Holidays.

- Emergency Service:                                           24 hours a day/7 days per week

  An emergency is any condition that causes the central processing unit or a departmental segment of the application software to be inoperable.

    B. **Software:** LikeMind Support – Software services will include:

- Telephone support to solve operational or technical problems.
- Response to service requests within two (2) hours during the Standard Support Period.
- All enhancements to the standard System to include routine updates and updates to the System dictated by applicable changes in Federal and State regulations.
- A secure connection between Evident and any Evident servers located at the hospital.
- Maintenance to keep the System in compliance with the Warranty Specifications.
- Correction of any programming error.

**Certification:** Certain applications provided by Evident require annual user certification from Evident. If such software applications are supported under this Agreement, Evident will provide Customer with annual user certification training at no additional cost. It is expressly understood that Evident, at its option, may terminate support for any application that requires such user certification should Customer fail to receive or maintain the required certification for the application.

    C. **Hardware:** LikeMind Support – Hardware services will include:

- Maintenance to keep service equipment in good operating condition.
- Response to service requests within two (2) hours during the Standard Support Period.
- Replacement of on-site service equipment not repaired within forty-eight (48) hours.
- Repair and return of service equipment requiring maintenance.
- Shipping of all replacement equipment to the hospital. (Customer will be responsible for return shipments.)



# Master Services Agreement
## Exhibit A
## Services and Service Fees

### Business Service:   nTrust – EHR Service (Evident)
### Evident EHR Service - Schedule 1

D.  **Exclusions:** LikeMind Support **does not** include:

- On site electrical work external to any equipment.
- On site Internet or telephone service needed to establish communication connectivity.
- Installation, movement, or maintenance of any equipment not provided by Evident.
- Service or repair of damage resulting from accident, transportation after delivery, neglect, misuse, unauthorized service, acts of God or any causes other than ordinary use.
- Furnishing of supplies, accessories or magnetic media.
- Making specification changes or providing equipment relocation services.



# Master Services Agreement
# Exhibit A
# Services and Service Fees

## Business Service:   nTrust – EHR Service (Evident)
## Evident EHR Service - Schedule 1

3. **Subscription Services:**

    A. **Content:**  Content Subscription Services will include:

- The initial delivery and installation of the following third party data;

        **Thrive EHR:**

        Micromedex Ultimedex (Pharmacy Clinical Monitoring)

        Micromedex CareNotes (Patient Education)

        Micromedex InfoButton (Infobutton)

        HLI Software and HLI Content (Clinical Vocabulary/Code Mapping)

        American Hospital Association Uniform Billing Codes (AHA UB Codes)

        American Medical Association Current Procedural Terminology (CPT©) Codes (AMA CPT Codes)

        **AHT EHR:**

        First Drug Database with State Controlled Substances

- Delivery of data updates that have been made available to Evident.

**Service Disclaimer:** The subscription content **will not** be created by Evident.  Evident **makes no guarantee** as to the validity or accuracy of the content and **does not** accept any responsibility for any consequences arising out of its use.

    B. **Services:**  Service Subscriptions will include:

- The initial set-up of and provision of access to the following services;

        Patient Portal – Continuity of Care Document (CCD) Access



# Master Services Agreement
# Exhibit A
# Services and Service Fees

## Business Service:   nTrust – EHR Service (Evident)
## Evident EHR Service - Schedule 2

**Conversion/Setup**

If an application listed below is included in Exhibit A, Evident will be responsible for the data conversion/set up of the items listed below as applicable.  Customer will be responsible for providing an electronic copy and/or printed hard copy, as applicable, of all pertinent information to be converted.

1. **Financial Applications**

    General Ledger
    - Chart of Accounts
    - Account Balances (Monthly Activity)
    - Balance Sheet Format
    - Profit/Loss Statement Formats

    Patient Accounting (A/R and Bad Debt)
    - Patient Demographic and Guarantor Info
    - Outstanding Primary Insurance
    - Beginning Balance (as of cut-off date)

    Payroll
    - Employee Masters
    - Year to Date Employee Balances
    - Quarter to Date Employee Balances

    Patient Accounting (Master Charge List)
    - Item Master

    Accounts Payable
    - Vendor Masters

    Patient Accounting (Business Office Tables)
    - Department Table
    - Room List
    - Physician List
    - Insurance Company Table
    - Service Code Table
    - System Operation Tables

2. **Clinical Applications**

    Laboratory
    - Normal Ranges
    - Reflex Criteria
    - Calculations
    - Report Formats
    - Quality Control Definitions

    Pharmacy
    - Vendor Item Conversion and Upload
    - Formulary Conversion and Upload
    - Order Definitions
    - Calculations

    Physical Therapy
    - Transcription Headers
    - Transcription Formats

    Cardiopulmonary
    - ABG Formats
    - Transcription Formats
    - Transcription Headers

    Radiology
    - Patient Preparation Information
    - Transcription Headers
    - Transcription Normals
    - Quality Control Definitions
    - Mammography Tables and Definitions
    - Recall Letters and Notifications

    OR Management
    - Preference Cards
    - Procedure List
    - Instructions
    - Locations
    - Equipment/Instruments
    - Anesthesiologist Tables/Types
    - Physicians
    - Reason Codes



# Master Services Agreement
# Exhibit A
# Services and Service Fees

## Business Service:   nTrust – EHR Service (Evident)
## Evident EHR Service - Schedule 2

3.  **Patient Care Applications**

Order Entry
- Order Formats
- Help Screens
- Item Conversion for Charges
- Standing/Group Orders

Point of Care
- Chart Types
- Initial Interview
- Physical Assessment
- Nursing Activities
- MedAct  (Electronic Kardex)
- Configuration of Site Specific Preferences
- Report Formats

Enterprise Wide Scheduling
- Caller ID/Locations
- Fax Tables
- Instructions
- Tasks
- Conflict Codes

Physician Documentation
- Templates
- Macros
- Instructions

It is expressly understood and agreed that any electronic forms and/or templates converted by Evident for Customer shall be included in a template library to be maintained by Evident.  In consideration of contribution to the template library, Customer shall be provided unlimited access to the content contained in the template library.

It is further understood that any templates obtained by Customer from the template library must be thoroughly reviewed by Customer prior to use.  Evident makes no guarantee as to the validity or accuracy of the templates available in the template library and does not accept any responsibility for any consequences arising out of their use.



# Master Services Agreement
# Exhibit A
# Services and Service Fees

## Managed IT Service:  nTrust – Cloud Computing

A.  **Services and Fees:**

1.  **Services:**  The Cloud Computing Services will include:

- Creation and maintenance of the environments listed below on equipment maintained in TruBridge's data center;

  One (1) Evident Healthcare Information System (HIS) Environment

  One (1) AHT Healthcare Information System (HIS) Environment

- Daily backup of the HIS environment.

- Regular physical and electronic security reviews.

**Regular Maintenance Window:**  When routine maintenance is necessary for the TruBridge data center equipment used to provide the Cloud Computing Services, the maintenance will be performed during a designated maintenance window.  TruBridge will make best efforts to provide notification at least seven days prior to a scheduled maintenance window.

**Performance Disclaimer:  Cloud Computing Services <u>does not</u> include connectivity.**  TruBridge can provide connectivity services, however TruBridge <u>will not</u> be responsible for any system performance issues that may occur as a result of connectivity that is not provided by TruBridge.  For cloud environments that will be accessed regularly by users as part of the standard operation of the environment, TruBridge recommends a minimum of 75 Kbps of available bandwidth per each concurrent user.

2.  **Service Fees/Payment Schedule**

a.  **Service Activation Fee** – Due at signing                                    Included*

b.  **Monthly Cloud Computing Fee**                                              Included*

*Note:  The Service Activation Fee and, so long as the Exhibit A for Accounts Receivable Management Services (ARMS) remains in effect, the monthly fee are included in the service fees for ARMS.

The service includes i) an initial 500 gigabytes of storage space for the Evident HIS Environment; and ii) access for 15 devices and a maximum of 60 gigabytes of storage for the AHT HIS Environment.  In the event additional storage space is needed in the future, TruBridge will provide a quote.

B.  **Service Term:**                                                          Five (5) Years

Pricing specified in this Exhibit A will remain valid for a period of 60 days from the date of submission.

Page 30 of 40



# Master Services Agreement
## Exhibit A
## Services and Service Fees

## Business Service:  nTrust – Medical Necessity Database Updating

A.  **Services and Fees:**

1.  **Service:**   Medical Necessity Database Updating services include weekly electronic updates for changes in published Local Coverage Determinations and the Lab National Coverage Determination Policies.

    **Data Disclaimer:**   TruBridge will be providing data that is published and provided electronically by the Centers for Medicare and Medicaid Services.  **TruBridge makes no guarantee as to the validity or accuracy of the data.**

2.  **Service Fees/Payment Schedule:**

    Medicare Medical Necessity Criteria*

    a.  **Service Activation Fee**:                                          Included*
    b.  **Monthly Service Fee:**                                          Included*

    *Note:   The Service Activation Fee and, so long as the Exhibit A for Accounts Receivable Management Services (ARMS) remains in effect, the Monthly Service Fee are included in the service fees for ARMS.

    The above service is for the medical necessity criteria published by the Centers for Medicare and Medicaid Services for Medicare only.

B.  **Service Term:**                                                          Five (5) Years



# Master Services Agreement
# Exhibit A
# Services and Service Fees

**Business Service:  nTrust Business Intelligence Services –
Software and Dashboard Subscription**

A. **Services and Fees:**

1. **Service:**  The Business Intelligence Services (BIS) will include the following:

   - Initial set-up and education of Customer personnel.
   - Software Subscription:
     - Provision of a business intelligence dashboard framework that is integrated into Customer's electronic health record (EHR) system to include:
       - Integration with EHR data;
       - Integration into EHR workflow;
       - Integration with EHR security protocols and access authorizations.
     - Provision of on-going support for the use of the software.

   - Dashboard Subscription:
     - Provision of on-going support for the use of dashboard software and panels.
     - Access to TruBridge's Dashboard Panel Library.
     - Use of all dashboard panels available in the Dashboard Panel Library.
     - Provision of updates to the Dashboard Panel Library as new and/or enhanced dashboard panels are made available by TruBridge.

   - Access to all future BIS subscription services developed by TruBridge.

   **It is expressly understood that Customer may only access and use the software, dashboards, and any other BIS subscription services so long as this Exhibit A remains in effect.  Termination of this Exhibit A shall result in the loss of the use of <u>all</u> software, dashboards, and self-services provided hereunder.**

2. **Service Fees/Payment Schedule:**

   a. **Activation Fee** – Due at signing                                    Included

   b. **Monthly Subscription Fee**:                                          Included

   > *Note:   The Service Activation Fee and, so long as the Exhibit A for Accounts Receivable Management Services (ARMS) remains in effect, the Monthly Subscription Fee are included in the service fees for ARMS.

B. **Service Term:**                                              Five (5) Years



# Master Services Agreement
# Exhibit A
# Services and Service Fees

**Business Service:   nTrust Business Intelligence Services –
Software and Dashboard Subscription**

C.  **HIPAA Authorizations:**

1.  **Data Aggregation/De-Identification:**  It is expressly understood that certain aspects of services provided under this Exhibit A may result in "Data Aggregation" as that term is defined in 45 C.F.R. § 164.501.  The aggregated data will be utilized by TruBridge in the performance of services under this Exhibit A and as contracted with other customers for similar and/or other analytic services for the express purpose of supporting the "Health Care Operations," as that term is defined in 45 C.F.R § 164.501, of participating TruBridge customers (the "Program"). It is further understood that certain aspects of the Program may necessitate the de-identification of data as provided in 45 C.F.R. §164.514.

2.  **Use of Data:**

    A.  Customer authorizes TruBridge to:
       i)   download Customer data (the "Data") to systems located and maintained in TruBridge's data center (the "Data Servers");
       ii)  use the Data to conduct Data Aggregation;
       iii) use the Data exclusively for the purposes of the Program; and
       iv)  when applicable, de-identify the Data.

    B.  TruBridge warrants that it shall:
       i)   download and maintain the Data on the Data Servers to be located in a secure facility;
       ii)  limit access to the Data to authorized TruBridge employees and agents;
       iii) aggregate the Data with data from other Program participants;
       iv)  use the Data exclusively for the purposes of the Program; and
       v)   when applicable, de-identify the Data in compliance with 45 C.F.R. §164.514(b).

3.  **HIPAA Compliance:** The Program shall be conducted in full compliance with the requirements of the Health Insurance Portability and Accountability Act of 1996, and regulations promulgated there under, including the Standards for Privacy of Individually Identifiable Protected Health Information and Standards for the Security of Electronic Protected Health Information at 45 Code of Federal Regulations ("C.F.R.") Parts 160 and 164 and the Health Information Technology for Economic and Clinical Health Act of 2009.



# Master Services Agreement
# Exhibit A
# Services and Service Fees

**Business Service:  nTrust Business Intelligence Services –
Software and Dashboard Subscription**

D. **Logi Analytics, Inc.:**  The BIS Software and all supplemental BIS utilize software provided by Logi Analytics, Inc. under license to TruBridge.  Logi Analytics, Inc., as third party licensor of Logi Analytics Software requires additional terms and conditions applicable to their products.

1. Licensee shall restrict access to and use of the Logi Analytics Software to machine-readable, executable, object-code or bytecode form only.

2. Licensee is prohibited from (a)  allowing use of the Logi Analytics Software by any third party other than Licensee for the Licensee 's internal business purposes; (b) using the Logi Analytics Software in any time-sharing, service bureau, application service provider or software-as-a-service arrangements or services, including any use to provide services or process data for the benefit of, or on behalf of, any third party; (c)  transferring or conveying the rights or licenses granted to Licensee; and (d) causing or permitting the reverse engineering, disassembly or decompilation of the Logi Analytics Software;

3. Logi Analytics, Inc. is a third party beneficiary of the agreements between Licensor and Licensee with respect to the Licensee's use of, or obligations with respect to, the Logi Analytics Software, with full authority to enforce such rights.  LOGI ANALYTICS, INC. DISCLAIMS ANY AND ALL WARRANTIES AND LIABILITIES FOR ANY LICENSEE LOSSES OR DAMAGES, WHETHER DIRECT OR INDIRECT, INCLUDING INCIDENTAL OR CONSEQUENTIAL DAMAGES, ARISING FROM THE USE OF THE LOGI ANALYTICS SOFTWARE.



# Business Associate Agreement

In regard to any and all mutual covenants executed by and between COMPUTER PROGRAMS AND SYSTEMS, INC., inclusive of all of its wholly owned subsidiaries, (hereinafter "Business Associate") and CROOK COUNTY MEMORIAL HOSPITAL (hereinafter "Covered Entity") under which Business Associate provides services to Covered Entity (each a "Service Agreement" and collectively "the Service Agreements"), it is mutually understood and agreed to by both parties that:

1. <u>Business Associate Responsibilities</u>.  The performance of Business Associate's obligations as set forth in the Service Agreements could require Business Associate's receipt of or access to Protected Health Information.  The parties are subject to the Administrative Simplification requirements of the Health Insurance Portability and Accountability Act of 1996, and regulations promulgated there under, including the Standards for Privacy of Individually Identifiable Protected Health Information and Standards for the Security of Electronic Protected Health Information at 45 Code of Federal Regulations ("C.F.R.") Parts 160 and 164 and the Health Information Technology for Economic and Clinical Health Act of 2009 (collectively the "Regulations").  The Regulations require Covered Entity to enter into a contract with Business Associate, in its role as a "business associate" under the Regulations, in order to mandate certain protections for the privacy and security of Protected Health Information.  The provisions of this Agreement set forth the obligations of Business Associate as a "business associate" under the Regulations.

2. <u>Definitions</u>.  The following terms shall have the same meaning as those terms in the Regulations: "Disclose," "Disclosed" and "Disclosure"; "Protected Health Information"; "Use" (in both its verb and noun forms) or "Uses"; "Data Aggregation"; "Health Care Operations"; "Individual"; "Breach"; "Unsecured Protected Health Information"; "Designated Record Set"; "Secretary"; and "Security Incident."

3. <u>Permitted Uses and Disclosures of Protected Health Information</u>.  Business Associate:

    (a) shall Use and Disclose Protected Health Information that is deemed to be minimally necessary or appropriate to develop, operate and maintain those activities described in the Service Agreements and as provided in this Section 3;

    (b) shall Disclose Protected Health Information to Covered Entity upon request;

    (c) may, as necessary for the proper management and administration of its business or to carry out its legal responsibilities:

        (i) Use Protected Health Information;

        (ii) Disclose Protected Health Information if (A) the Disclosure is required by law, or (B) Business Associate obtains reasonable assurance from the person to whom the



# Business Associate Agreement

information is Disclosed that the Protected Health Information will be held confidentially and Used or further Disclosed only as required by law and for the purpose for which it was Disclosed to the person, and the person agrees to notify Business Associate of any instances of which the person is aware in which the confidentiality of the Protected Health Information has been breached. Business Associate will in turn notify Covered Entity of any breach of confidentiality known to it as a result of this third party provision as provided in section 5 of this Agreement. Only information which is minimally necessary to satisfy the request will be Disclosed;

(d) may perform Data Aggregation for the Health Care Operations of Covered Entity; and

(e) may de-identify Protected Health Information provided that Business Associate implements de-identification criteria in accord with 45 C.F.R. §164.514(b).

Business Associate shall not Use or Disclose Protected Health Information for any other purpose or in any manner that would constitute a violation of the Regulations if so Used or Disclosed by Covered Entity.

4. <u>Adequate Safeguards</u>. Business Associate warrants that it shall implement and maintain:

(a) adequate safeguards to prevent the Use or Disclosure of Protected Health Information in any manner other than as permitted by this Agreement; and

(b) administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the electronic Protected Health Information that Business Associate may create, receive, maintain, or transmit on behalf of Covered Entity.

5. <u>Reporting</u>. Business Associate shall report to Covered Entity each Use or Disclosure that is made by Business Associate, its employees, representatives, agents or subcontractors, but is not specifically permitted by this Agreement and/or any Security Incident of which it becomes aware. The initial report shall be made by telephone call to Covered Entity's designated "Privacy Officer" within forty-eight (48) hours from the time the Business Associate determines that a non-permitted Use or Disclosure and/or Security Incident has occurred, followed by a written report to the "Privacy Officer" no later than five (5) days from the date the Business Associate determines that such non-permitted Use or Disclosure and/or Security Incident has occurred.

6. <u>Breach</u>. In the event an impermissible Use or Disclosure is made by Business Associate, its employees, representatives, agents or subcontractors in the course of providing Covered



# Business Associate Agreement

Entity with services that are "covered functions" as defined in 45 C.F.R. § 164.103 and it is determined that such impermissible Use or Disclosure constitutes a Breach, the parties shall work together in good faith to create and implement a mutually agreed upon plan to accomplish Breach notifications as may be required under, and in compliance with, the Regulations.

7. <u>Access and Amendment of Protected Health Information</u>.  To the extent Business Associate maintains Protected Health Information in a Designated Record Set in the performance of its obligations under the Service Agreements, Business Associate will provide Covered Entity, or at Covered Entity's direction the Individual or the Individual's designee, with access to Protected Health Information as necessary to satisfy Covered Entity's obligations under 45 C.F.R § 164.524 and perform any amendments to such Protected Health Information in accordance with 45 C.F.R § 164.526.  In the event Business Associate should receive a request from an Individual regarding access to or amendment of the Individual's Protected Health Information, Business Associate shall forward any such request to Covered Entity for review and fulfillment.

8. <u>Compliance with Privacy Rule</u>.  To the extent the Business Associate is to carry out one or more of Covered Entity's obligation(s) under Subpart E of 45 C.F.R. Part 164, Business Associate will comply with the requirements of Subpart E that apply to the Covered Entity in the performance of such obligation(s)

9. <u>Availability of Internal Practices, Books and Records to Government Agencies</u>.  Business Associate agrees to make its internal practices, books and records relating to the Use and Disclosure of Protected Health Information available to the Secretary for purposes of determining Covered Entity's and Business Associate's compliance with the Regulations.

10. <u>Accounting of Disclosures of Protected Health Information</u>.  Upon an Individual's request, Business Associate shall provide to Individual an accounting of each Disclosure of Protected Health Information made by Business Associate or its employees, agents, representatives or subcontractors in accordance with 45 C.F.R. § 164.528.  The accounting shall include: (a) the date of the Disclosure; (b) the name, and address if known, of the entity or person who received the Protected Health Information; (c) a brief description of the Protected Health Information disclosed; and (d) a brief statement of the purpose of the Disclosure.  For each Disclosure, Business Associate shall track the information specified in (a) through (d), above, and shall securely maintain the information for six (6) years from the date of the Disclosure.



# Business Associate Agreement

11. <u>Termination</u>.  In addition to and notwithstanding the termination provisions set forth in the Service Agreements, this Business Associate Agreement and the Service Agreements may be terminated if it is materially proven that a party has intentionally violated any term of this Agreement.  Upon notification, the breaching party shall use its best efforts to immediately cure a reported violation or use every means available to cure the violation as quickly as practicable.  In the event a reported violation cannot be cured immediately, the breaching party shall have thirty (30) days to cure any violation before any termination clause may be exercised.  In the event neither termination nor cure is feasible, the non-breaching party shall report the breach to the Secretary.  Business Associate's obligations under this Agreement shall survive after termination only in the event that Business Associate retains any of Covered Entity's Protected Health Information, otherwise Business Associate's obligations under this Agreement shall terminate upon the termination or expiration of the Service Agreements and disposition of any Covered Entity Protected Health Information as provided herein.

12. <u>Disposition of Protected Health Information Upon Termination or Expiration</u>.  Upon termination or expiration of the Service Agreements, Business Associate shall either return or destroy, in Covered Entity's sole discretion and in accordance with any instructions by Covered Entity, all Protected Health Information in the possession or control of Business Associate or its agents and subcontractors.  However, if Covered Entity determines that neither return nor destruction of Protected Health Information is feasible, Business Associate may retain Protected Health Information provided that Business Associate (a) continues to comply with the provisions of this Agreement for as long as it retains Protected Health Information, and (b) further limits Uses and Disclosures of that Protected Health Information to those purposes that make its return or destruction infeasible.

13. <u>No Third Party Beneficiaries</u>.  There are no third party beneficiaries to the provisions of this Agreement.

14. <u>Use of Subcontractors and Agents</u>.  Business Associate shall require each of its agents and subcontractors that receive Protected Health Information from Business Associate to execute a written agreement obligating the agent or subcontractor to comply with all the terms of this Agreement.

15. <u>Inclusion in the Service Agreements</u>.  The terms and conditions of this Business Associate Agreement shall hereby be included in all Service Agreements executed by and between the parties.  In the event of a conflict between any term or condition of the Service Agreements



# Business Associate Agreement

and this Business Associate Agreement, the terms and conditions of this Business Associate Agreement shall govern.

16. <u>Miscellaneous</u>.

   A. <u>Regulatory Reference</u>.   Reference in this Agreement to the Regulations means the Regulations as in effect or as amended.

   B. <u>Amendment</u>.   The parties agree to take such action as is necessary to amend this Agreement from time to time as is necessary for the parties to comply with applicable requirements of the Regulations.

   C. <u>Interpretation</u>.   Any ambiguity in this Agreement shall be resolved to permit each party to comply with applicable requirements of the Regulations.

*[Signature page follows]*



# Business Associate Agreement

**IN WITNESS WHEREOF,** the parties hereto have executed this Business Associate Agreement.

**CROOK COUNTY MEMORIAL HOSPITAL**

713 East Oak Street

Sundance, WY 82729

By: *Micki Lyons*

(Authorized Signature)

Name: Micki Lyons

(Printed)

Title: Chief Executive Officer

Date: Oct 9, 2020


**COMPUTER PROGRAMS AND SYSTEMS, INC.**

6600 Wall Street

Mobile, AL 36695

By: *Christopher L Fowler*

Christopher L Fowler (Oct 9, 2020 16:16 CDT)

(Authorized Signature)

Name: Christopher L. Fowler

(Printed)

Title: Chief Operating Officer

Date: Oct 9, 2020