IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| TRUBRIDGE, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | Civil Action No. 24-00190-KD-N |
| ) | |
| CROOK COUNTY MEDICAL ) | |
| SERVICES DISTRICT FOUNDATION, ) | |
| INC., d/b/a CROOK COUNTY ) | |
| MEMORIAL HOSPITAL, ) | |
| ) | |
| Defendant. ) | |

**ORDER**

This action is before the Court on the Motion for Temporary Restraining Order and Preliminary Injunction filed by Defendant Crook County Medical Services District Foundation, Inc. (CCMSD) (doc. 10). CCMSD reports that its correct name is Crook County Medical Services District, that it is a special hospital district established pursuant to Wyo. Stat. § 35-2-401, *et seq.,* and a local governmental entity of the State of Wyoming, located in Sundance, Wyoming.

I. Background

"CCMSD operates a hospital and three clinics in Crook County, Wyoming. The hospital is designated a 'Critical Access Hospital' by the Centers for Medicare/Medicaid Services because it serves a rural medically underserved area" (doc. 9, p. 2). In October 2020, TruBridge, Inc. and CCMSD entered a "Master Service Agreement" for TruBridge to provide "accounts receivable management services (e.g. patient billing, insurance, claim follow-up, receipting, etc.), cloud computing, medical necessity database updating, and access to Trubridge's"

electronic health record (EHR) system (doc. 1, p. 2) (doc. 1-1, p. 10-16 "Business Service – Accounts Receivable Management"; Id., p. 17-31, "Business Service" "EHR").  The five (5) year term for services began "on or around" July 1, 2021, and would end "on or around" June 30, 2026. (doc. 1, p. 3).

The Agreement provides that CCMSD will pay TruBridge a monthly service fee of 5.43% of CCMSD's "Cash Collections" as defined in the Agreement, and that CCMSD would "provide TruBridge with access to the data necessary to perform the" services under the Agreement. (Id.). The Agreement also provides that if CCMSD "intentionally creates any impediment to such access" it would pay "an amount equal to the prorated Service Fee that would have accrued for an affected Service during the remainder of the Service's then current term." (Id.).

Twice TruBridge "learned" that CCMSD might stop using TruBridge's EHR system and implement a different system (Id., p. 4). TruBridge twice wrote CCMSD of the potential consequences, including that using a competitor's EHR system would be a material breach of the Agreement (Id.).  After the second letter, in March 2024, CCMSD confirmed that it had implemented a new EHR system effective March 10, 2024, and later wrote that it "would no longer permit TruBridge to perform the remainder of the Business Services identified" in the Agreement, which included accounts receivable management services (Id.).

TruBridge alleges that on or around March 24, 2024, "CCMSD stopped providing TruBridge the information necessary to provide those services such as new patient account information." (Id., p. 4).  TruBridge notified CCMSD in April 2024, that the Agreement had been breached and that the amount due for the term of the Agreement was approximately

$992,355.84. (doc. 1, p. 5).   On June 14, 2024, TruBridge filed this breach of contract action against CCMSD. (Id.)

In response, CCMSD filed a Verified Answer and Counterclaim for declaratory and injunctive relief, for breach of contract and other equitable relief, and Motion for Temporary Restraining Order (docs. 9, 10). CCMSD answers that TruBridge suspended all services to CCMSD as of March 20, 2024 (doc. 9, ¶ 18, p. 6).  CCMSD admits that it did not pay the amount claimed by TruBridge and denies that any payment is due (doc. 9, p. 7).  In the counterclaim, CCMSD alleges that TruBridge breached the Agreement because the EHR system did not function correctly and because TruBridge failed to perform the accounts receivable management services (doc. 9, p. 12-21).

CCMSD alleges that accounts receivable management is "critical to the financial survival of CCMSD, to the professionals performing medical services at CCMSD's hospital, and to CCMSD's ability to provide quality healthcare to its patients" (doc. 9, p. 14).  CCMSD also alleges that the "EHR system is essential to healthcare professionals' ability to provide medical care to patients of CCMSD." (Id.).

CCMSD outlines multiple problems and deficiencies that manifested in the accounts receivable management services[1] and the EHR,[2] the multiple reports and complaints to

---

[1] CCMSD alleges that when "TruBridge took over" the accounts receivable management, the accounts receivable increased significantly from an average monthly gross balance in 2021 of $1,758,521.00, to $3,118,490.00 in 2022, and to $3,255,352.00 in 2023 (doc. 9, p.16).  Thus, instead of reducing CCMSD's accounts receivable, i.e., getting payment for CCMSD, TruBridge almost doubled the uncollected accounts receivable.  CCMSD alleges that TruBridge did not "satisfactorily work" the accounts receivable. Instead, TruBridge allowed accounts to age over 120 days which significantly reduced the likelihood of recovery, did not follow up on unpaid invoices but instead "simply resubmitted the invoice and later advised CCMSD write-off the same" (Id., p. 17) and made billing errors which "caused CCMSD's cash flow to decline". (Id., p. 18).  CCMSD alleges that this unsatisfactory work "forced" it "to hire a contractor to work account receivables to provide cash flow and mitigate its damages." (Id.)  And that "TruBridge was paid pursuant to the Agreement on those collections." (Id.)

3

TruBridge regarding same, and TruBridge's repeated failure to resolve the problems and deficiencies. CCMSD alleges that TruBridge's repeated failures caused concerns for patient safety as well as financial survival and created the need to obtain a new EHR system and new accounts receivable management service (Id., p. 14-15) CCMSD alleges that TruBridge's unsatisfactory work on accounts receivable caused CCMSD to transfer $1.7 million from its CD and construction fund to pay ordinary business expenses (Id., p. 17).  CCMSD alleges that the accounts receivable balance is now $1.8 million "taking into account" the efforts of the collection contractor and that the "balance is declining in collectible value as the receivables age." (Id., p. 18)

CCMSD also alleges that TruBridge's insufficient billing practices caused the cash flow to decline and TruBridge's "incorrect postings resulted in inaccurate financials for review by CCMSD's Board of Trustees." (Id.) And as a result, CCMSD was "forced to hire an outside firm to prepare financials." (Id.).

II. Analysis

This action is now before the Court on CMMSD's Motion for Temporary Restraining Order (doc. 10).  CCMSD seeks a temporary restraining order and preliminary injunction which provides as follows:

---

[2] Among several deficiencies, CCMSD alleges it advised TruBridge that its "providers" had "concerns" that the EHR system was "unsafe for patients; that there are no clinical monitoring tools; and that it lacks patient outcome research" (doc. 9, p. 14). And that patient safety concerns contributed to the "decision to switch to an EHR system" (Id., p. 15). CCMSD alleges that "Providers also continued to deal with bottlenecks, resulting in the inability of CCMSD clinics to timely get patients in and out the door, delayed ordering imaging and labs, and delayed obtaining imaging, laboratory, and other results" which forced CCMSD to "hire additional clinic staff to perform document management" (Id.). CCMSD alleges that TruBridge offered assistance by way of a physician for one day to help providers with the EHR system, an "'optimization team'" to resolve issues with the EHR system which was never implemented, and a "'Communication

    A. Permission to immediately contract with another provider for Accounts Receivable Management Services and/or billing services;

    B. Immediate release of accounts so that CCMSD can pursue collections on its patients' accounts without interference by TruBridge;

    C. Immediate freezing of any assets/accounts that TruBridge holds for CCMSD;

    D. Ordering TruBridge to immediately remit any and all sums due to CCMSD under the Agreement as such sums are received and to segregate and account for the percentage to which TruBridge would be entitled but for its breach;

    E. Ordering TruBridge to immediately cease and desist any and all collection activity on behalf of CCMSD, including but not limited to contacting any of CCMSD's payors;

    F. Ordering TruBridge to immediately turnover and release to CCMSD any and all records of CCMSD's accounts, including but not limited to patients' accounts; and

    G. Ordering TruBridge to immediately provide a complete accounting of collections and remittances for any and all accounts placed with TruBridge for collection.

(Doc. 10, p. 19-20).

    To obtain a preliminary injunction or a temporary restraining order, CCMSD must establish "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1223, 1225–26 (11th Cir. 2005) (citing Ingram v. Ault, 50 F. 3d 898, 900 (11th Cir. 1995); Gonzalez v. Governor of Ga., 978 F.3d 1266, 1270–71 (11th Cir. 2020) (same). A temporary restraining order or preliminary injunctive relief is "'an

---

Center' which allowed electronic faxing, but the faxes were not tied back to patient's charts

extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the burden of persuasion as to all four elements.'" Moore v. Dooly SP Warden, No. 22-10453, 2023 WL 5927138, at *7 (11th Cir. Sept. 12, 2023) (quoting Horton v. City of St. Augustine, 272 F.3d 1318, 1326 (11th Cir. 2001)). Thus, CCMSD must ultimately make a substantial showing as to all four elements to obtain preliminary injunctive relief.

CCMSD argues that unless it is "permitted to engage another firm to perform its accounts receivable management and/or billing services" and obtain the relief requested in the motion, "CCMSD will be financially vulnerable and not able to provide needed medical services to its patient population" (doc. 10, p. 7).  CCMSD argues that TruBridge's breach of the Agreement causes CCMSD to face "severe financial consequences that may render it unable to provided needed medical services to its patient population" and it will "suffer immediate and irreparable harm" (Id., p. 8-9). CCMSD argues that the evidence shows that TruBridge failed to properly manage CCMSD's accounts receivable and that its continuing improper management "cannot be remedied by monetary or legal damages" and therefore irreparable without injunctive relief (Id., p. 9).  CCMSD argues that it has no adequate remedy at law because TruBridge's improper management "threatens CCMSD's ability to remain viable as a going concern and to continue to provide quality health care to its patients." (Id., p. 10).

The Court agrees that irreparable injury is the *sine qua non* of injunctive relief.  Siegel v. LePore, 234 F. 3d 1163, 1176 (11th Cir. 2000).  The Court acknowledges CCMSD's argument that TruBridge is not collecting money owed to CCMSD which would be used to pay operating expenses and provide patient services, etc. at the hospital and clinics.  The Court also acknowledges CCMSD's allegation that at some point in time it used $1.7 million of its own funds to pay its operating expenses and hired a contractor to collect accounts receivable. And

which led to treatment delays." (doc. 9, p. 14-15).

that to date, with collection by CCMSD's contractor, the amount of "accounts receivable in TruBridge's system is" $1.8 million, albeit with a declining collectible value (doc. 10, p. 7, ¶ 19).

However, CCMSD has failed to show how TruBridge's alleged failure to manage the accounts receivables threaten CCMSD's viability to the point that its injury cannot be repaired by monetary relief. CCMSD alleges that its viability is at risk but has not provided any evidence regarding its current financial status or how TruBridge's conduct has injured its financial status to the point that it is in danger of financial ruin but for the alleged failure to properly collect accounts receivables. The alleged irreparable injury must be "neither remote nor speculative, but actual and imminent." Ne. Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990). "An injury is 'irreparable' only if it cannot be undone through monetary remedies. The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.'" Id.; Kumi v. United Asset Mgmt., LLC, 574 F. Supp. 3d 1253, 1259 (N.D. Ga. 2021) (finding irreparable injury when 63-year-old homeowner would be ejected from her home of sixteen years); Sprint Commc'ns, Inc. v. Calabrese, 2024 WL 1463416, at *5 (11th Cir. Apr. 4, 2024) (affirming the district court's decision to grant an injunction for violation of the Lanham Act explaining that "[r]emedies at law are inadequate to address the harm of confusion that would arise without the injunction."); Bonilla v. Librati, 2021 WL 2580552, at *2 (S.D. Fla. Apr. 26, 2021), modified, 2021 WL 3396124 (S.D. Fla. Apr. 30, 2021) (granting a TRO where plaintiff demonstrated that the vessel at issue "could leave the country in a matter of hours" and defendant had already liquidated assets); Marine Turbo Eng'g, Ltd. v. Turbocharter Servs.

Worldwide, LLC, 2011 WL 6754058, at *10 (S.D. Fla. Dec. 22, 2011) (harm caused by trade secret misappropriation "is clearly an injury, which is not easily quantifiable in monetary terms").

Moreover, the events upon which CCMSD bases its need for a temporary restraining order occurred in March 2024. CCMSD states that "[s]ince March 20, 2024, TruBridge suspended all services to CCMSD" (doc. 10, p. 9).[3] CCMSD waited until July 2024 to seek injunctive relief. See Bethune-Cookman, Univ., Inc. v. Dr. Mary McLeod Bethune Nat'l Alumni Ass'n, Inc., 2023 WL 3704912, at *3 (11th Cir. May 30, 2023) ("We have recognized that 'a party's failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm.' … 'Indeed, the very idea of a preliminary injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits.' … Thus, '[a] delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm.") (citing and quoting Wreal, LLC v. Amazon.com, Inc., 840 F.3d 1244, 1248 (11th Cir. 2016)).

CCMSD also argues that it has shown a substantial likelihood of success on the merits (doc. 10, p. 10). The argument consists of the following paragraph:

> The likelihood-of-success-on-the-merits element is largely factual and dependent on circumstances surrounding the case. Here, the evidence supporting CCMSD's claims is overwhelming. There is hard evidence that TruBridge has breached its Agreement. (See Doc. 9). Consequently, CCMSD has shown a substantial likelihood of success on the merits.

---

[3] CCMSD has not clarified whether TruBridge suspended all services which would include accounts receivables, EHR, etc., or only suspended "all services" related to the EHR services (doc. 10, p. 7, ¶18, doc. 10, p. 9). The motion is unclear as to whether no accounts receivables have been collected since March 2024, TruBridge is still collecting accounts receivables, or CCMSD's contractor is collecting the accounts receivable.

(Id.)  The Court will not review CCMSD's Verified Answer and Counterclaim and find the "hard evidence" which shows CCMSD's substantial likelihood of success.

### III. Conclusion

Accordingly, the Motion for Temporary Restraining Order is DENIED.

**DONE** and **ORDERED** this the 19th day of July 2024.

<u>**s / Kristi K. DuBose**</u>
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**